UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS, INC.  ) | |
| d/b/a LEHMAN CAPITAL,                      ) | |
|        Plaintiff,                          ) | |
|                     ) | |
| vs.                                                   ) | 1:04-cv-1432-RLY-TAB |
|                     ) | |
| LAUREATE REALTY SERVICES, INC.,   ) | |
| LAUREATE CAPITAL, CORP.,              ) | |
| NETBANK, INC., NETBANK FSB,          ) | |
| RESOURCE BANCSHARES MORTGAGE) | |
| GROUP, INC. and THOMAS PEACOCK,  ) | |
|        Defendants.                      ) | |

**ENTRY ON
(1) PLAINTIFF'S AMENDED MOTION FOR PARTIAL SUMMARY
JUDGMENT ON THE ISSUE OF LIABILITY, (2) LAUREATE REALTY
SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT,
(3) THOMAS PEACOCK'S MOTION FOR SUMMARY JUDGMENT,
(4) LAUREATE REALTY SERVICES, INC.'S and THOMAS PEACOCK'S
REQUEST FOR ORAL ARGUMENT, and (5) NETBANK, INC.'S MOTION FOR
SUMMARY JUDGMENT**

On May 1, 1997, plaintiff Lehman Brothers Holdings, Inc. d/b/a Lehman Capital

("Lehman") and defendant Laureate Realty Services, Inc. ("Laureate") entered into a

Mortgage Loan Purchase and Sale Agreement ("MLPSA").  The MLPSA obligated

Laureate to, among other things, originate and underwrite loans to be sold to Lehman

consistent with the standards employed by a reasonable commercial lender.

In January 1998, Laureate sold a loan to Lehman secured by a shopping center

1

known as the Hickory Ridge Commons Center ("Hickory Ridge" or "Property") located in Memphis, Tennessee. After the loan defaulted, Lehman alleges that it learned, among other things, that certain loan origination and underwriting representations and warranties that Laureate made to Lehman to induce Lehman to acquire the Hickory Ridge Loan were false and that, in fact, Laureate had made contrary representations about the Property at the very same time to one of Laureate's largest clients, Nationwide Life Insurance Co. ("Nationwide"), the then owner of the Property.

Lehman thereafter filed suit against Laureate, Laureate Capital Corp.,[1] NetBank, Inc. ("NetBank"), NetBank, FSB ("FSB"), Resource Bancshares Mortgage Group, Inc. ("Resource"), and Thomas Peacock ("Peacock) alleging fraud (Count I) and breach of contract (Count II). (*See* Second Amended Complaint ¶¶ 25-33). Lehman also seeks a declaratory judgment that one or more of the corporate defendants is a legal successor to Laureate's liabilities to Lehman under the MLPSA (Count III). (*Id.* ¶¶ 34-36).

Before the court are the following motions: (1) Lehman's Amended Motion for Partial Summary Judgment on the Issue of Liability of Laureate; (2) Laureate's Motion for Summary Judgment on Counts I and II of the Second Amended Complaint; (3) Peacock's Motion for Summary Judgment on Count I of the Second Amended Complaint; (4) Laureate's and Peacock's Request for Oral Argument; and (5) NetBank's Motion for Summary Judgment on Count III of the Second Amended Complaint. For the reasons

---

[1] Laureate became Laureate Capital Corp. in 1999 and has since dissolved. Moreover, NetBank FSB and Resource are no longer parties to this action.

2

explained in the court's opinion, the court **DENIES** Lehman's Motion for Partial

Summary Judgment on the Issue of Liability; **GRANTS** in part and **DENIES** in part

Laureate's Motion for Summary Judgment; **GRANTS** Peacock's Motion for Summary

Judgment; **DENIES** Laureate's and Peacock's Request for Oral Argument; and

**GRANTS** NetBank's Motion for Summary Judgment.

## I.    Summary Judgment Standard

Summary judgment is proper only if the record shows "that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P.  56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the burden of informing the court of the basis for its motion and

demonstrating the "absence of evidence on an essential element of the non-moving

party's case," *Celotex Corp.*, 477 U.S. at 323, 325.  To withstand a motion for summary

judgment, the nonmoving party may not simply rest on the pleadings, but rather must

"make a showing sufficient to establish the existence of [the] elements] essential to that

party's case, and on which that party will bear the burden of proof at trial...." *Id.* at 322.

If the non-moving party fails to make this showing, then the moving party is entitled to

judgment as a matter of law.  *Id.* at 323.

In determining whether a genuine issue of material fact exists, the court must view

the record and all reasonable inferences in the light most favorable to the non-moving

party.  *See Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264 (7th

Cir. 1996).  No genuine issue exists if the record viewed as a whole could not lead a

3

rational trier of fact to find for the non-moving party.  *See Matsushita Elec. Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Ritchie v. Glidden Co.*, 242 F.3d

713, 720 (7th Cir. 2001).

**II.     Facts Section**[2] [3]

In Laureate's Response, it moved to strike certain evidence cited by Lehman in

support of its Motion for Partial Summary Judgment on Liability.  Because the subject

matter of Laureate's motion requires a background of the relevant facts, the court will

discuss those rulings in Section IV.A.3.

**Facts Relevant to Lehman's, Laureate's and Peacock's Motions for Summary
Judgment**

**A.     The MLPSA**

1.     Laureate, a South Carolina corporation, and Lehman entered into the MLPSA,

which had an effective date of May 1, 1997.  (*See* MLPSA).

2.     Pursuant to the terms of the MLPSA, Laureate agreed to sell, and Lehman agreed

to purchase, Mortgage Loans (as that term is defined in the MLPSA).  (*Id.* at

---

[2] The parties filed their respective designated evidence, including cited portions of depositions of key witnesses, in "parts."  Finding the cited evidence in electronic format, therefore, became an arduous and frustrating task.  Accordingly, the court requests that the parties file all future deposition exerpts and related documents, to the extent possible, as one document.

[3] Lehman's exhibits are listed in Docket Nos. 168, 170-74, 209, Peacock's exhibits are cited in Docket No. 187, Laureate's exhibits are cited in 205-06.  Because as explained above, the parties cited certain exhibits in parts, the court elects to cite to the parties' affidavits and depositions as "Plaintiff's/Defendants' Aff. ¶ ____/Dep. at ____", and all documents as "Plaintiff's/Defendants' Ex. ____."  NetBank's exhibits, cited in Docket No. 190, are cited as "NetBank Ex. ____."  Those exhibits cited in Docket No. 184 will be so indicated.

Introduction).

3.     The terms of the MLPSA contemplated that Lehman would subsequently pool and

sell the loans purchased from Laureate in connection with commercial mortgage

backed securities transactions.  (*Id.*).

4.     Through the MLPSA, Laureate made numerous express representations and

warranties to Lehman with respect to each Mortgage Loan it sold to Lehman.  The

chief representations were that: (i) the information regarding each Mortgage Loan

as delivered to Lehman, was true, complete and accurate; (ii) Laureate's

origination and underwriting standards were commercially reasonable and

customary for a prudent commercial lender, and Laureate's actual origination and

underwriting practices would comply therewith; (iii) Laureate would not provide

Lehman with any written information that was untrue in any material respect or

that omitted to disclose any material fact; and (iv) no Laureate employee or agent

would participate in or condone any fraud in connection with Laureate's

origination or underwriting of any Mortgage Loan originated for Lehman.  (*Id.* §§

2(a)(xii), 2(b)(ii), 2(b)(vi), 2(b)(xlv), 2(b)(xlviii), and 2(b)(lii)).  Laureate further

agreed that Lehman had the right to assign each of Laureate's representations and

warranties to new purchasers when Lehman subsequently sold the loans in

connection with its mortgage backed securities transactions.  (*Id.* ¶ 3(c)).

## B. Skinner & Broadbent Seek to Refinance the Hickory Ridge Commons Retail Center

5. During the fall of 1997, Skinner & Broadbent, Co. ("Skinner & Broadbent") contacted Thomas Peacock ("Peacock"), Executive Vice President of the Mortgage Company of Indiana ("MCI"), a division of Laureate Realty Services, Inc., to refinance several loans secured by shopping centers Skinner & Broadbent owned and operated.  (Affidavit of Thomas Peacock ("Peacock Aff.") ¶¶ 2-3).

6. By that time, George Broadbent ("Broadbent"), a principal at Skinner & Broadbent, had known Laureate's Senior Vice President Thomas Gracey ("Gracey") for more than twenty-five years, and was a long time customer of Gracey.  (Deposition of Thomas Gracey ("Gracey Dep.") at 17-18).

7. One of the properties Skinner & Broadbent was seeking to refinance was secured by a shopping center in Memphis, Tennessee, known as the Hickory Ridge. (Peacock Aff. ¶ 4).  Hickory Ridge was secured by a loan held by Nationwide. (*Id.* ¶ 14).

8. At that time, Nationwide was the biggest, or at least one of the biggest, clients of Laureate.  (Deposition of Thomas Dennard ("Dennard Dep.") at 235-26).

9. Hickory Ridge consisted of approximately 333,312 square feet of retail space. Home Quarters owned a building in the center consisting of approximately 84,919 square feet; thus, 247,393 square feet of retail space was owned by Skinner & Broadbent.  (Defendants' Ex. E at Lehman 02-01257).

6

10.   Joyce Bradley ("Bradley"), an Executive Vice President with Skinner &
      Broadbent, compiled a marketing brochure that included a rent roll, historical
      income figures, and a summary of demographics of the area.  Bradley provided
      this information to Peacock and other mortgage brokers in an effort to secure a
      refinancing Skinner & Broadbent deemed favorable.  (Deposition of Joyce Bradley
      ("Bradley Dep.") at 17-23; Peacock Aff. ¶ 5).

11.   After receiving and reviewing the information, Peacock contacted David
      Rosenberg ("Rosenberg"), an employee of Lehman.  (Peacock Aff. ¶ 7).  Peacock
      provided Rosenberg with the information he was provided from Bradley.  (*Id.*).

12.   In September 1997, Rosenberg, Peacock, and Bradley met, either in person or by
      phone, to discuss the terms upon which Lehman was willing to lend money to
      Skinner & Broadbent secured by each of the Skinner & Broadbent properties.
      (Bradley Dep. at 61-62).

**C.    Lehman Shows Interest in Funding the Hickory Ridge Loan**

13.   In October 1997, Lehman determined that it was interested in pursuing the funding
      of the Hickory Ridge Loan.  (Deposition of David Rosenberg ("Rosenberg Dep.")
      at 49-52).  A loan application was issued, which was signed by Peacock on behalf
      of Laureate.  (Peacock Aff. ¶ 8).  Although Laureate was referred to as the
      "lender," it was understood that Lehman would be providing the funds and
      simultaneously receiving assignment of the loan, mortgage and related security at
      closing.  (*Id.*).  Lehman Brothers reviewed and approved the loan application prior

to its issuance.  (Rosenberg Dep. at 52).  In particular, Lehman determined the parameters under which it would make the loan.  (*Id*. at 49)  Lehman also entered into a confidentiality agreement with Broadbent whereby personal financial information of Broadbent was provided directly to Lehman and not Laureate.  (*Id*. at 44).

### D.    Property-Related Information and Documentation

14.    After execution of the application, Lehman provided Laureate with a "document request list."  Laureate began to gather documents from Skinner & Broadbent that Lehman requested Laureate to provide.  The requested documents included a rent roll, historical and operating expenses for the shopping center, information related to the demographics of the property, copies of leases with the various tenants of the property and summaries of these leases.  (*Id*. at 59-60; Deposition of Scott Larsen ("Larsen Dep.") at 261-62; Peacock Aff. ¶ 9; Deposition of John Herman ("Herman Dep.") at 80).

15.    Laureate also retained third party vendors to provide an appraisal, a property condition survey, and an environmental assessment.  (Peacock Aff. ¶ 10).

16.    Laureate retained Jerry W. Fletcher ("Fletcher"), a member of the Appraisal Institute ("MAI") from Cincinnati, Ohio, to perform an appraisal of Hickory Ridge.  (Deposition of Jerry W. Fletcher ("Fletcher Dep.") at 7, 9).

17.    Fletcher issued his report to Lehman on December 12, 1997. (Fletcher Dep. at 44-45).

18.     Fletcher concluded that the property was worth $22,950,000 as of December 3, 1997.  (Defendants' Ex. E).

19.     Fletcher obtained a temporary license from the State of Tennessee to perform the appraisal on December 12, 1997, the same day he issued his appraisal.  (*Id*. at 161; Plaintiff's Ex. 3 attached to Fletcher Dep.).

20.     Except for the appraisal at issue in this case, Fletcher had never appraised any properties in the Memphis area.  (Fletcher Dep. at 148-49).

21.     Lehman provided Laureate with a loan template in which Laureate typed data extracted from the appraisal, the environmental report, and the engineering report, and the documents obtained from Skinner & Broadbent pursuant to the document request list.  (Peacock Aff. ¶ 12; Rosenberg Dep. at 67-70).  The template performed calculations after data was fed into its fields.  (Larsen Dep. at 213-16).

22.     Lehman had access to the template throughout the origination process and was able to make changes and send these changes back to Laureate.  (*Id*. at 249-50).

23.     On January 9, 1998, Rosenberg and Peacock visited Hickory Ridge.  (Peacock Aff. ¶ 13; Rosenberg Dep. at 62).  Rosenberg documented his visit in a memorandum dated January 12, 1998, which was placed in the underwriting file.  (Defendants' Ex. G).  Rosenberg reported that he spoke to the managers of Upton's, Sears Home Life, and Home Quarters stores, an anchor tenant that was not part of the collateral.  (Rosenberg Dep. at 91-93).  He reported that the Property has "consistently achieved 95+% occupancy," and that although Home Quarters' sales

declined due to the opening of a Home Depot, "sales have since increased and appear to have stabilized." (Defendant's Ex. G). He also stated that he and Peacock "toured the neighborhood" and noted that many major retailers were located along the same corridor as the Property. (Defendants' Ex. G).

24.   On January 6, 1998, Laureate transmitted to Lehman a full "underwriting box." (Rosenberg Dep. at 62-64; Herman Dep. at 149-50). The "underwriting box" contained a completed template, loan memorandum ("Loan Memo"), and all of the items listed on the "documents request list." (Herman Dep. at 149-50).

25.   Despite the fact that the complete underwriting box was shipped on January 6, 1998, the Loan Memo, which bears Peacock's name, is dated January 19, 1998. (*Id.*).

26.   The Loan Memo, initially prepared by Peacock and Scott Larsen ("Larsen"), a Laureate underwriter, purported to provide a comprehensive assessment of the proposed loan by Lehman on Hickory Ridge. (Larsen Dep. at 140). At the conclusion of the Loan Memo, Larsen listed the following as "pluses" of the Property: (i) it was located in an affluent sector of Memphis; (ii) had excellent attributes for growth and escalating rentals; (iii) was in good physical condition; (iv) had good curb appeal and a good maintenance program; (v) had an experienced management/leasing team; (vi) had exceptional ownership and financial strength; and (vii) was 95% leased, with diverse tenants. (Defendants' Ex. G). "Minuses" included the fact that two large retail spaces, Planet Music and

Premium Pet Products, were vacant.  (*Id*.).  "Mitigating factors" included the following: (i) the Property was well maintained, requiring no immediate repairs; (iI) there was a pending lease for the vacant Premium Pet Products space; (iii) Planet Music continued to pay its rent even though it was no longer in business; and (iv) there was minimal turnover in the first five years.  (*Id*.).  The Loan Memo concluded by stating, "Based on these factors and the overall strength of the property as listed above, [Laureate] recommends a loan of $18,000,000 as outlined in the loan summary."  (*Id*.).  Laureate also represented in writing to Lehman that one of the two vacant spaces was subject to a lease pending.  (Plaintiff's Ex. U).

27.     Like the template, drafts of the Loan Memo were sent back and forth between Lehman and Laureate and Lehman had the ability to make changes to it.  (Larsen Dep. at 284-87; Deposition of Angelo Meimeteas ("Meimeteas Dep.") at 63-64).

28.     All substantive information in the loan template and Loan Memo came from Laureate.  (Larsen Dep. at 140-42; *see also* Herman Dep. at 49-50).

29.     Upon receipt of the underwriting box, the information provided to Lehman was reviewed and analyzed by the "deal team" consisting of Rosenberg and Angelo Meimeteas ("Meimeteas").  It was then presented to a three-man committee because the request exceeded $15 million.  (Meimeteas Dep. at 43-44; Deposition of Brett Ersoff ("Ersoff Dep.") at 94-96; Herman Dep. at 21-22).  The committee consisted of John Herman ("Herman"), Brett Ersoff ("Ersoff"), and Michael Mazzei.  (Ersoff Dep. at 94).  Herman and Ersoff each had approximately seven

11

years of experience in commercial real estate lending at the time the Hickory
Ridge Loan was originated.  (Herman Dep. at 289; Ersoff Dep. at 54-57).

30.    On January 23, 1998, Lehman issued its Purchase Commitments for the funding of
the Hickory Ridge Loan.  (Rosenberg Dep. at 100-05).  On the same date,
subsequent to receiving the Purchase Commitment, Laureate issued a commitment
letter for the funding of the Loan.  (Deposition of Mark Hill ("Hill Dep.") at 92-
96).  The commitment letter was executed by Mark Hill ("Hill") on behalf of
Laureate.  (*Id*.).  Lehman dictated the terms of the commitment letter and approved
it before Hill sent it to Skinner & Broadbent.  (*Id*.).

### E.    The Rate Lock Agreement and the Nationwide Letter

31.    On January 27, 1998, Skinner & Broadbent executed a Rate Lock Agreement.
(Bradley Dep. at 101-05).  The purpose of the Rate Lock Agreement was to
guarantee a specified interest rate for the loan.  (*Id*. at 101-02).  Similar to the loan
application and commitment letter, the Rate Lock Agreement was drafted so that
Laureate was listed as the "lender," however, Lehman dictated its issuance and
contents.  (Peacock Aff. ¶ 12).

32.    The existing Nationwide loan carried a prepayment penalty of approximately
$1,000,010.00.  (*Id*. ¶ 21).  Skinner & Broadbent did not intend to bring additional
funds to the closing table and therefore, the prepayment penalty needed to be
reduced to complete the loan transaction in the amount of $18,000,000.  (Peacock
Aff ¶ 15; Deposition of George Broadbent ("Broadbent Dep.") at 47; Bradley Dep.

at 108).

33.    Peacock could not recall having a conversation with a Lehman employee regarding

the Nationwide prepayment penalty, but testified "that there was probably

discussion about it."  (Plaintiff's Ex. K, Deposition of Thomas Peacock ("Peacock

Dep." at 207-08, 248).

34.    In connection with the Rate Lock Agreement, Gracey directed Peacock to write a

letter to Peter Lynch, an employee of Nationwide, for Nationwide's file (the

"Nationwide Letter" or "Letter").  (Peacock Aff. ¶ 17).  The Letter, dated January

27, 1998, stated, *inter alia*, that: (i) there was an immense amount of unleased "B"

space in the area surrounding the Property which was competing with the Property

for new tenants; (ii) new construction of commercial retail space was negatively

influencing the Property's economics; (iii) at least one current anchor tenant was

already experiencing financial difficulty and could become a major problem for

the Property in the event of that tenant's bankruptcy; and (iv) the Property's

owner, Skinner & Broadbent, had been continually attempting to sell the property

because it had lost a high level of confidence in the market where the Property was

located.  (Plaintiff's Ex. Y).  The Letter implied that it was an opportune time for

Nationwide to unload the loan to a "less sophisticated lender" and that doing a deal

with Lehman provides the removal of a potential future problem for Nationwide.

(*Id.*).

35.    One day after Peacock's Letter, Nationwide agreed to reduce from $1,025,514.54

13

to $450,000 the prepayment penalty on the note held for Skinner & Broadbent's affiliate in order to facilitate the affiliate's refinancing through Lehman of the existing loan on the Hickory Ridge Property.  (Plaintiff's Ex. Z).

36.     Nobody from Laureate conveyed the negative information contained in the Nationwide Letter to Lehman employees Ersoff, Herman, Rosenberg and Meimeteas prior to the closing of the Hickory Ridge Loan.

37.     On January 30, 1998, the Hickory Ridge Loan closed.  (Peacock Aff. ¶ 12).

**F.     The Assignment of the Hickory Ridge Loan to Lehman**

38.     On the closing date, Laureate executed documents that assigned the Hickory Ridge Loan to Lehman.  Specifically, Laureate executed documents entitled "Assignment/Transfer of (Lien of) Assignment of Leases and Rents," "Assignment of Mortgage Loan Documents," "Assignment/Transfer of (Lien of) Mortgage/Deed to Secured Debt/Beneficial Interest under Deed of Trust," and an "Allonge" (collectively "Transfer Documents").  (*See* Hill Dep. at 110-17).  Each of these documents indicated that the Hickory Ridge Loan was being assigned "without representation, recourse or warranty by [Laureate]."

39.     On May 1, 1998, Lehman transferred the Hickory Ridge Loan to First Union Commercial Mortgage Securities, Inc., so that it could be placed into a securitization known as the First Union-Lehman Brothers-Bank of America Commercial Mortgage Pass-Through Certificates, Series 1998-C2 Trust ("FULBBA Trust"). Lehman transferred the Hickory Ridge Loan pursuant to a

14

document entitled Mortgage Loan Purchase Agreement ("MLPA").

### G.     Relevant Events After Assignment

40.     The borrower made payments on the loan for over five (5) years.  In June and July

2003, it failed to make its full monthly payments and made no payments thereafter.

(Bradley Dep. at 141-42).

41.     In a letter dated December 19, 2003, ORIX Capital Markets, LLC ("ORIX") (the

"ORIX Letter"), as special servicer of the FULBBA Trust, detailed the warranties

that ORIX alleged Lehman had breached in the MLPA with respect to the Hickory

Ridge Loan.  (Plaintiff's Ex. FF).

42.     On January 6, 2004, Hickory Ridge was sold at a foreclosure sale for $4,450,000

to Hickory Ridge Investment, LLC, successor in interest to ORIX as Servicer.

(Plaintiff's Ex. LL; Plaintiff's Ex. MM).

43.     In a letter dated February 12, 2004, Lehman provided Laureate with the ORIX

Letter and informed Laureate that it would like to discuss with Laureate the

allegations set forth in the ORIX Letter.  (Plaintiff's Ex. FF).

44.     On March 23, 2004, Lehman was sued in Dallas County, Texas by ORIX and

Wells Fargo Bank, N.A., as Trustee, relating to the pool of mortgage loans,

including the Hickory Ridge Loan, sold to the Certificateholders of the FULBBA

Trust ("Texas Lawsuit").  (*See* Plaintiff's Ex. JJ).  The plaintiffs sought, among

other things, an order requiring Lehman to repurchase the Hickory Ridge Loan.

(*Id*. ¶ 48).

15

45.     In a letter dated April 5, 2004, Lehman provided notice to Laureate pursuant to Section 3(b)(ii) of the MLPSA.  (Plaintiff's Ex. GG).  That particular section of the MLPSA requires that Lehman give "prompt written notice" to Laureate in connection with a claim that Laureate breached certain representations and warranties contained within the MLPSA.  (*See* MLPSA ¶ 3(b)(ii)).

46.     The Texas Lawsuit was resolved through a Settlement Agreement whereby Lehman purchased the interest of the FULBBA Trust in the Hickory Ridge Loan for a payment of $18,171,826.55 plus $3,353.49 daily interest from June 30, 2004 until closing.  (Plaintiff's Ex. KK).

**Facts Relevant to NetBank's Motion for Summary Judgment**

47.     Laureate Reality Services, Inc., originally incorporated in South Carolina in 1994, changed its name to Laureate Capital Corp. in 1999.  (Dennard Dep. at 16-17).

48.     Laureate Capital Corp. was a wholly owned subsidiary of former defendant Resource Bancshares Mortgage Group, Inc. ("Resource").  (Second Amended Complaint ¶ 2).

49.     On November 17, 2001, NetBank, Resource and Palmetto Acquisition Corp. ("Palmetto") entered into an agreement and plan of merger, which called for Resource to merge into Palmetto.  Palmetto was a wholly owned subsidiary of NBI, created for the purpose of acquiring Resource's shares.  The plan of merger called for shareholders of Resource to receive NetBank stock as consideration for the transaction.  As a result of this transaction, Resource became a wholly owned

16

subsidiary of NetBank.  (NetBank Ex. B).

50.    Laureate Capital Corp. changed its name to MG, Inc. in October 2000, (Laureate's
       Answer ¶ 2), and on March 28, 2002, MG, Inc.[4] dissolved.  (Affidavit of R. Jeffrey
       Turnage ("Turnage Aff.") ¶ 4).

51.    At the time Laureate dissolved, it distributed its only asset, a receivable from
       Resource in the amount of $14.1 million to Resource, thus cancelling the debt.
       Accordingly, the total sum received from Laureate upon its dissolution was $14.1
       million.  (Turnage Dep. at 16).

52.    On June 1, 2002, NetBank transferred all of the shares of Resource to FSB, a
       federal savings bank and wholly owned subsidiary of NetBank.  (Turnage Aff. ¶
       14).

53.    On July 1, 2004, Resource dissolved.  (*Id.* ¶ 16).

54.    All of Resource's assets at the time of its dissolution were distributed to its sole
       shareholder, FSB.  (Turnage Dep. at 7-8).

55.    On May 1, 2006, Lehman filed a Complaint for Declaratory Judgment ("State
       Court Complaint") in Marion Superior Court 11 ("State Court Action").  (NetBank
       Ex. C).  In the State Court Complaint, Lehman alleged that "[Resource Bancshares
       Mortgage Group, Inc.] as the sole shareholder and successor entity of the Laureate
       Entities is liable to the extent that the corporate assets of the Laureate Entities were

---

[4] For simplicity's sake, the court will refer to Laureate Realty Services, Inc., Laureate
Capital Corp., and MG, Inc. as "Laureate."

distributed to it." (*Id*. ¶ 9).  Lehman further sought a declaration that ". . . FSB is

the distributee of [Laureate Realty Services's] assets."  (*Id*. ¶ 6).

56.   On November 30, 2006, the Marion Superior Court entered an agreed judgment

which ordered that FSB is obligated to pay up to $14.1 million of any judgment

entered against Laureate Realty Services, Inc. in this matter.  (NetBank Ex. A

(Docket # 184)).

57.   Any additional facts necessary to the determination of this Entry will be addressed,

where appropriate, in Sections IV and V below.

## III.   Motion for Oral Argument

Defendants Laureate and Peacock (collectively "Defendants") request oral

argument on their respective motions for summary judgment and on Lehman's motion for

partial summary judgment against Laureate.  The court finds that the issues raised in this

case do not warrant oral argument; therefore, the court **DENIES** the motion.

## IV.   Lehman's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment

### A.   Count II, Breach of Contract

In Count II, Lehman alleges that the Loan Memo intentionally omitted critical

information known to Laureate with respect to Hickory Ridge as summarized in the

Nationwide Letter.  Lehman contends that had it been apprised of the material

information contained within the Nationwide Letter – information a prudent commercial

lender would want to know –  it would not have committed $18 million to fund and

purchase the Hickory Ridge Loan.  Thus, Lehman contends that Laureate breached the following representations and warranties contained within Section 2 of the MLPSA: (1) that Laureate would not participate or condone any fraud in connection with its origination and underwriting of the Hickory Ridge Loan (MLPSA § 2(b)(lii)); (2) that the origination practices of Laureate as delivered to Lehman were true and accurate and that it would not omit any material facts (*id*. §§ 2(a)(xii), 2(b)(xlv)); (3) that Laureate's underwriting standards were commercially reasonable and customary for a prudent commercial lender, and that Laureate's origination and underwriting practices would comply with those standards  (*id*. §§ 2(b)(ii), 2(b)(vi), 2(b)(xlviii)).  Lehman also alleges that Laureate breached the representations and warranties designed to prohibit self-dealing (*id*. ¶ 2(b)(xxvii).  This allegation is different from Lehman's other claims for breach of warranty in that it is not based upon the contents of the Nationwide Letter.  Rather, this allegation is based upon the reduced prepayment penalty that Laureate negotiated on behalf of Skinner & Broadbent.  In short, Lehman alleges that after Laureate negotiated the reduced prepayment penalty on Skinner & Broadbent's behalf, the proceeds of the Hickory Ridge Loan were used to satisfy the reduced prepayment penalty owed to Nationwide, one of Laureate's biggest clients.

Lehman moves for partial summary judgment on Count II as to liability against Laureate.  Defendants Laureate and Peacock move for summary judgment on Count II of Lehman's Second Amended Complaint solely on grounds that Lehman's claim is barred by the statute of limitations.  Laureate also raises this argument in opposition to Lehman's

motion for summary judgment as to liability on Count II.  The court will begin its

discussion with Defendants' statute of limitations defense.

### 1.      Statute of Limitations

Section 9 of the MLPSA contains a "Governing Law" provision that provides:

> This Agreement will be governed by and construed in accordance with the
> substantive laws of the State of New York (without regard to conflicts of
> laws principles), and the obligations, rights and remedies of the parties
> hereunder shall be determined in accordance with such laws.

(MLPSA, Section 9).  Defendants interpret this provision to mean that New York's six-

year statute of limitations applicable to breach of contract claims applies to this case.

Lehman asserts that Indiana's ten-year statute of limitations applies.  This issue is pivotal

to the disposition of this case because if New York's statute of limitations applies,

Lehman's breach of contract claim is time-barred.

A federal district court sitting in diversity must follow the choice of law rules of

the state in which it sits.  *Autocephalous Greek-Orthodox Church v. Goldberg & Feldman

Fine Arts, Inc.*, 717 F.Supp. 1374, 1385 (S.D. Ind. 1989).  Indiana law treats statutes of

limitations as procedural, rather than substantive, and therefore not subject to choice of

law disputes.  *McLaughlin Equip. Co. v. SerVaas*, 2004 WL 1629603, at * 45 (S.D. Ind.

Feb. 18, 2004) (internal citation and quotation omitted).  Thus, federal courts sitting in

diversity in Indiana routinely apply Indiana's statute of limitations, even where, as here,

another statute's substantive law governs the underlying claims at issue.  *See Tokio

Marine & Fire Ins. Co. v. Giffels Assoc., Inc.*, 2005 WL 2127085, at *2 (S.D. Ind. Sept. 1,

2005) ("[D]espite the Kentucky choice of law provision in the contract between Toyota and Giffels, Indiana procedural applies to this case.  Under Indiana law, statutes of limitations are procedural."); *McLaughlin Equip. Co.*, 2004 WL 1629603, at * 46 ("The court concludes that it must apply Indiana's choice of law rules, including its statute of limitations to McLaughlin's state law claims, even though another state's substantive law governs those claims."); *Bailey v. Skipperliner Indus., Inc.*, 278 F.Supp.2d 945, 951 (N.D. Ind. 2003) ("Under Indiana law, statutes of limitations are procedural, rather than substantive, and are not subject to the parties' choice of law disputes."); *Autocephalous Greek-Orthodox Church*, 717 F.Supp. at 1385 ("Because in Indiana statutes of limitations are procedural in nature, Indiana choice of law rules state that the statute of limitations of the forum state, Indiana, will apply.").  Like Indiana, New York deems statutes of limitations to be a matter of procedure, not substance.  *See Spanierman Gallery v. Merritt*, 2004 WL 1781006, at *4 (S.D.N.Y. Aug. 10, 2004) ("In New York, 'statutes of limitation are usually characterized as procedural, not substantive,' and New York courts apply local procedural rules, even when applying the law of another state.").

Despite this applicable law, Defendants contend that the plain language of Section 9 requires a different result.  In particular, they contend that, because the choice of law provision in the MLPSA contains the word "remedies," and because the Indiana Supreme Court has described statutes of limitation as "a matter that affects remedies," the choice of law provision "should be construed to encompass all aspects of the parties' remedies," including the statute of limitations.  In support of their position, Defendants cite the court

to *American Insurance Co. v. Frischkorn*, 173 F.Supp.2d 514, 520 (S.D. W. Va. 2001)

and *Jahn v. 1-800 Flowers.com, Inc.*, 2002 WL 32362244 (W.D. Wis. 2002).

In *Frischkorn*, the court addressed a unique choice of law provision which called

for the agreement to be "governed by and interpreted in accordance with the laws of the

state of State California applicable to disputes occurring entirely within such State."  173

F.Supp.2d 514, 520 (S.D. W. Va. 2001).  The court concluded that the language

mandating California law "to disputes occurring entirely within such State" encompassed

not only California substantive law, but also California procedural law.  *Id*.

In *Jahn*, the court held that the choice of law provision that provided for the

agreement to "be . . . enforced in accordance with the laws of the State of Texas"  2002

WL 32362244, at * 10, incorporated Texas' statute of limitations into plaintiff's breach of

contract claim.  In arriving at that conclusion, the court focused on the plain meaning of

the parties' agreement – particularly the parties' use of the word "enforced" – and

explained, "Obviously, a statute of limitations is concerned with whether the contract will

be given effect or enforced; a court cannot enforce a claim for breach of contract if the

statute of limitations has expired."  *Id*.

Unlike the cases above, the plain language of Section 9 provides that it "will be

governed by and construed in accordance with the substantive laws of the State of New

York . . .".  Section 9 unambiguously calls for the application of New York *substantive*

law.  Thus, only New York substantive law applies to this case.  Under Indiana's choice

of law rules, then, the court applies Indiana's ten-year statute of limitations to Lehman's

breach of contract claim.  As this case was filed on August 31, 2004, Lehman's breach of

contract claim falls easily filed within Indiana's statute of limitations period.

Accordingly, Defendants' motion for summary judgment on Count II of Lehman's

Amended Complaint is **DENIED**.

### 2.    Merits of Count II

"'[A]n action for breach of contract [under New York law] requires proof of: (1) a

contract; (2) performance of the contract by one party; (3) breach by the other party; and

(4) damages.'"  *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.

1998) (quoting *Rexnord Holdings, Inc. v. Biderman*, 21 F.3d 522, 525 (2d Cir. 1994)).  A

purchaser may hold a buyer liable for breach of an express warranty upon a showing that:

(1) the plaintiff and defendant entered into a contract; (2) the contract contained an

express warranty by the defendant with respect to a material fact; (3) the warranty was

part of the basis of the bargain; and (4) the defendant breached the express warranty.

*Promuto v. Waste Mgmt., Inc*., 44 F.Supp.2d 628, 642 (S.D.N.Y. 1999).  In order to

trigger a repurchase obligation of the seller, the breach of warranty must be a material

breach.  *See Morgan Guaranty Trust Co. of New York v. Bay View Franchise Mortgage

Acceptance Co.,* 2002 WL 818082, at * 4 (S.D.N.Y. Apr. 30, 2002).

Lehman contends the facts of this case mandate summary judgment in its favor.

Laureate raises a number of issues in its defense, including: (1) Lehman failed to provide

prompt written notice of the alleged breaches to Laureate; (2) Lehman failed to designate

evidence demonstrating how the alleged breaches materially and adversely affected its

23

interest in the Hickory Ridge Loan; (3) the Loan was assigned to Lehman "without recourse, representation, and warranty;" (4) there are genuine issues of material fact as to whether Laureate breached the warranties in the MLPSA; and (5) there is an issue of fact as to whether the Hickory Ridge Loan was subject to the MLPSA.  These arguments are addressed seriatim below.

### a.    Notice

Laureate contends that Lehman failed to give it prompt written notice as contemplated by the MLPSA of any alleged breaches of the warranties contained in Sections 2(a)(xii), 2(b)(xlv), or 2(b)(lii) of the MLPSA or that Laureate's failure to disclose the opinions in the Nationwide Letter was a breach of Section 2(b)(ii), 2(b)(vi), and 2(b)(xlvii).

Section 3(b)(ii) of the MLPSA governs this issue and provides, in relevant part:

> *Upon discovery by [Laureate] or [Lehman]* that . . . (ii) a breach of the foregoing representations and warranties (other than the representations and warranties set forth in Section 2(a)) . . ., which, in the case of either clause (i) or (ii), *materially and adversely affects the interest of the owner of such Mortgage Loan*, . . . the party discovering . . . (y) the existence of a Breach (such Mortgage Loan described in clause (y), being a "Defective Mortgage Loan") *shall give prompt written notice thereof to the other party*. Within 80 days of its discovery or its receipt of notice Mortgage Loan is a Defective Mortgage Loan Seller shall (i) *promptly cure* such defect or Breach in all material respects, or (ii) *repurchase such Mortgage Loan* in accordance with the directions of [Lehman] . . . It is understood and agreed that the obligations of [Laureate] set forth in this Section 3(b) to cure or repurchase a Defective Mortgage Loan constitute the sole remedies available to [Lehman] and its successors and assigns respecting a Breach.

(MLPSA, Section 10) (emphasis added).

The facts reflect that Lehman sent Laureate a letter dated February 12, 2004, with an attached copy of the ORIX Letter.  In relevant part, Lehman stated that "Lehman and its counsel would like to discuss with appropriate business people and counsel for Laureate the matters set forth in the [ORIX Letter]." (Plaintiff's Ex. FF).  The ORIX Letter, in turn, alleged that Lehman breached certain representations and warranties under the MLPSA – of note, that the origination, servicing and collection practices of Lehman or any prior holder met industry standards – and demanded that Lehman cure the breach or repurchase the Hickory Ridge Loan within 90 days.  (*Id*.).  The ORIX Letter specifically mentioned Laureate and the Nationwide Letter, noting that both Lehman and Laureate "knew or should have known the facts showing the false nature of those representations."  (*Id*.).  Moreover, in a letter dated April 5, 2004, Lehman expressly stated that notice was being sent pursuant to Section 3(b)(ii) of the MLPSA.

The court finds that the February 12, 2004, and April 5, 2004, letters constitute "prompt written notice" as contemplated by Section 3(b)(ii) of the MLPSA.  Under New York law, the term "promptly," as used in this context, "'does not mean immediately, but rather within a reasonable time.'"  *Morgan Guaranty Trust Co. of New York*, 2002 WL 88082, at *5 (quoting *K.M.L. Labs., Ltd. v. Hopper*, 830 F.Supp. 159, 166 (E.D.N.Y. 1993)); *In re Instruments for Undus., Inc.*, 496 F.2d 1157, 1160 n.5 (2d Cir. 1974).  The February 12, 2004, notice was less than two months after its receipt of the December 19, 2003, ORIX Letter.  Under New York law, notice given within two months of the discovery of an alleged breach of contract is deemed reasonable.  *See LaSalle Bank Nat'l*

25

*Assoc. v. Lehman Bros. Holdings, Inc.*, 237 F.Supp.2d 618, 637-38 (D.Md. 2002) (under New York law, notice given within two months of discovery of breaches of Mortgage Loan Purchase Agreement at issue constituted prompt notice). Lehman therefore provided notice within a reasonable time.

Laureate also contends that Lehman failed to give it notice at a time when it could have exercised its bargained for right to "cure" the alleged breaches or "repurchase" the Hickory Ridge Loan.

The facts reflect that the December 19, 2003, ORIX Letter informed Lehman that the Hickory Ridge Property would be sold at foreclosure on January 6, 2004. (Plaintiff's Ex. FF). Lehman forwarded the ORIX Letter to Laureate on February 12, 2004. Thus, by the time Laureate received notice of the alleged breaches, repurchase was impossible. While Lehman could have informed Laureate of the alleged breaches at an earlier time, the notice provision is not a condition precedent to Laureate's duty to cure or repurchase. Laureate's obligation to cure or repurchase under Section 3(b)(ii) of the MLPSA is triggered in either of two situations – upon notice of or when it discovers on its own a material defect in a mortgage loan or a breach of its representations and warranties.

Moreover, Laureate's argument that the sole remedy provision in Section 3(b)(ii) precludes Lehman from obtaining any remedy on its breach of contract claim is without merit, as that provision does not apply to breaches set forth in Section 2(a) of the MLPSA. Thus, even if the court were to find that Lehman failed to give prompt written notice as required by Section 3(b)(ii) of the MLPSA, Lehman would still be entitled to

26

pursue common law remedies for breach of contract with respect to Laureate's alleged breaches of Section 2(a)(xii).

For all of the reasons set forth above, the court finds that Lehman gave prompt written notice pursuant to the MLPSA to Laureate with regard to its breach of contract claim.

### b.      Lehman's Interest in the Hickory Ridge Loan

Laureate next contends that Lehman has designated no evidence showing how the alleged breaches materially and adversely affected Lehman's interest in the Hickory Ridge Loan as required by Section 3(b)(ii) of the MLPSA.  In other words, Laureate asserts that Lehman fails to show how the information contained within the Nationwide Letter – i.e., that Skinner & Broadbent has purportedly lost confidence in the Property and its efforts to sell the Property – had any effect on the Loan.  Lehman responds by citing to the affidavits of Ersoff, Herman, Rosenberg, and Meimeteas – Lehman employees who were intimately involved in the Hickory Ridge Loan transaction – who aver that had they known about the negative information contained within the Nationwide Letter, they would not have approved the Hickory Ridge Loan on behalf of Lehman. (Affidavit of Brett Ersoff ¶ 12; Affidavit of John Herman ¶ 7; Affidavit of David Rosenberg ¶ 9;  Affidavit of Angelo Meimeteas ¶ 11).  Although Laureate refers to this testimony as "suspect," the court finds it sufficient to raise a genuine issue of material fact as to whether the Nationwide Letter contained information that Lehman considered material to its decision to purchase the Hickory Ridge Loan.  In addition, the affidavits

raise an issue of fact as to whether the Hickory Ridge Loan had an adverse effect on Lehman as it remains undisputed that Lehman lost more than $13 million on the transaction.  Accordingly, the court finds a genuine issue of material fact exists as to whether the Hickory Ridge Loan materially and adversely affected Lehman's interest in the Hickory Ridge Loan.

<strong>c.    "Without Representation, Recourse or Warranty"</strong>

The Transfer Documents which effectuated the transfer of the Hickory Ridge Loan from Laureate to Lehman were transferred "without representation, recourse or warranty."  Laureate thus argues that this language precludes Lehman from asserting its breach of warranty claims based upon Section 2 of the MLPSA.  Lehman responds the "without recourse" language is belied by the plain language of the MLPSA. Section 10 of the MLPSA provides:

> Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated except by a writing signed by the party against whom enforcement of such change, waiver, discharge or termination is sought; provided, however, that each Waiver Letter shall be sufficient to amend the therein described representations and warranties in respect of the applicable Mortgage Loan to the extent necessary to make such representation or warranty true in respect of such Mortgage Loan.

(MLPSA § 10).  Thus, pursuant to Section 10, such a modification to the representations and warranties provided in Section 2 could only be accomplished through a Waiver Letter (as that term is defined in the MLPSA), signed by Lehman, which expressly identified the specific representations and warranties being waived or modified.  Here, there is no evidence of record of a Waiver Letter signed by Lehman which expressly identified the

28

specific representations and warranties being waived or modified.  The court therefore

finds that the "without recourse" language of the Transfer Documents does not preclude

Lehman from asserting its breach of warranty claims.

### d.     Material Issues of Fact Remain

#### 1.     Representation and Warranty Not to Commit a Fraud

Lehman alleges that Laureate breached the warranties contained in Section

2(b)(lii) of the MLPSA that it would not participate in or condone any fraud in connection

with its origination and underwriting of the Hickory Ridge Loan.  Section 2(b)(lii) of the

MLPSA provides:

> **No Fraud**.  No employee or agent of [Laureate] has participated in or
> condoned any fraud in connection with the origination or underwriting of
> the Mortgage Loan.  To the Best Knowledge of [Laureate], no fraud was
> committed against it in connection with the origination or underwriting of
> the Mortgage Loan.

(MLPSA § 2(b)(lii)).

To establish fraud by omission under New York law, a plaintiff must demonstrate:

"(1) that [the defendant] had a duty to disclose certain information; (2) that the withheld

information was material; (3) that [the defendant] acted with *scienter*; (4) that [the

plaintiff] reasonably relied on [the defendant] to disclose the facts omitted; and (5) that

the omissions caused a loss to [the plaintiff]."  *Wedbush Morgan Sec., Inc. v. Robert W.*

*Baird & Co.*, 320 F.Supp.2d 123, 129 (S.D.N.Y. 2004).

Lehman's claim is based upon the contents of the Nationwide Letter, which was

sent by Laureate to Nationwide with respect to the prepayment penalty on the Hickory

Ridge Loan that Skinner & Broadbent was hoping to reduce in an effort to secure the deal

with Lehman.  Lehman contends that the statements made in the Nationwide Letter –

which Lehman obtained through discovery during the Texas Lawsuit in 2004 – were

materially different than those contained in the Loan Memo, and that had it been apprised

of the Nationwide Letter, it would not have committed $18 million dollars to fund and

purchase the Hickory Ridge Loan.

A comparison of the statements at issue is instructive.  The Loan Memo

represented, *inter alia*, that the Property: (i) is located in an affluent sector of Memphis;

(ii) had excellent attributes for growth and escalating rentals; (iii) was in good physical

condition; (iv) had good curb appeal and a good maintenance program; (v) had an

experienced management/leasing team; (vi) had exceptional ownership and financial

strength; and (vii) was 95% leased, with diverse tenants.  (Defendants' Ex. G).  Although

the Loan Memo disclosed as "minuses" the fact that two retail spaces were empty, it

downplayed this information by identifying several "mitigating factors."  Laureate

assured Lehman through a separate writing that there was a lease pending on one of the

two vacant spaces.  (Plaintiff's Ex. U).

By contrast, the Nationwide Letter represented that: (i) there was an immense

amount of unleased "B" space in the area surrounding the Property which was competing

with the Property for new tenants; (ii) new construction of commercial retail space was

negatively influencing the Property's economics; (iii) at least one current anchor tenant

[Home Quarters] was already experiencing financial difficulty and could become a major problem for the Property in the event of that tenant's bankruptcy; and (iv) the Property's owner, Skinner & Broadbent, had been continually attempting to sell the Property because it had lost a high level of confidence in the market where the Property was located.  (Plaintiff's Ex. Y).

Lehman contends that its evidence establishes all the necessary elements of fraud. The Loan Memo omitted material information as evidenced by the Nationwide Letter; Lehman reasonably relied upon that information; Lehman suffered a substantial loss as a result of Laureate's material omissions; and Laureate acted with *scienter* as it benefitted from the purported fraud from the Hickory Ridge Loan transaction.  *JHW Greentree Capital, L.P. v. Whittier Trust Co.*, 2006 WL 1080395, at *1 (S.D.N.Y. Apr. 24, 2006) (Pursuant to New York law, *scienter* may be established by a showing that defendants benefitted from the purported fraud).

First, Laureate responds that the Nationwide Letter is not the "smoking gun" that Lehman claims it to be.  For example, Laureate contends that the appraisal by Fletcher disclosed the existence of new construction that could negatively affect the Property.  In support of this contention, Laureate cites and quotes the following from the appraisal: (1) "The heavy concentration of building and the various competing retail facilities have most likely affected per square foot sales."  (Defendant's Ex. E at Lehman 04-01215); (2)  "Decreases [in sales at the Hickory Ridge Property] would reflect the fact that there has been significant building competition over the past four years."  (*Id*. at 04-01257); (3)

31

The appraisal notes that 30,000 square feet of "B" space within the Value City/Value City Furniture Center is available to be leased.  (*Id*. at 04-01270); and (4) The appraisal discusses the development of a new center in Germantown and "continued substantial expansion and development in the area . . .".  (*Id*. at 04-01215).

The cited and quoted portions of the appraisal – a rather thick document – are arguably taken out of context.  With respect to quoted portions (1) and (4), the appraisal reads:

> As was previously indicated in the neighborhood data, subject's immediate neighborhood shows significant occupancy strength, notwithstanding continued substantial expansion and development in the area.  This development has occurred predominantly east of the subject property, including . . . the Cross Creek Center at Germantown extension, . . .
>
> As was indicated, the overall vacancy is less than 5.0% in the area, indicating significant strength.  The heavy concentration of building and the various competing retail facilities most likely have affected per square foot sales.  The sales in the subject shopping center . . . are acceptable and would be expected to increase when building is completed in the area and population continues to grow and support higher sales.

(*Id*. at 04-0125).  With respect to (2), the appraisal reads:

> (6)      A review of store sales data indicates averages sales in the center at this time.  Certain stores show increases in the actual sales while others show decreases.  Decreases would reflect the fact that there has been significant building competition over the past four years.

(*Id*. at 04-01257).  Finally, with respect to (3), the appraisal reports:

> Space Available:      30,000 SF B space and a vacant pad for 100,000 SF plus or minus.

(*Id*. at 04-01270).  Thus, while the appraisal did contain the statements asserted by

Laureate, the statements are couched in terms "negating" the "negative" and accentuating the positive. Accordingly, the court finds a genuine issue of material fact as to whether the appraisal adequately disclosed the existence of new construction that could negatively affect the Property.

Second, Laureate cites to Rosenberg's January 12, 2004, memorandum, which notes that Home Quarters' sales were doing well, for the proposition that Lehman "need not have relied upon the speculation about Home Quarters contained in the Nationwide Letter." (Defendants' Response at 36). Rosenberg's trip to Hickory Ridge, as reflected by his memorandum, states that he was there for a short duration to meet the tenants of the Property. Nowhere in the memorandum does Rosenberg discuss Home Quarters' possible bankruptcy. To the contrary, Rosenberg's memorandum states that Home Quarters' sales were "stable" even given the increased competition caused by the opening of a Home Depot approximately 1.5 miles from the Property. (Defendants' Ex. G) ("According to the store manager [of Home Quarters], sales at the subject [sic] declined when Home Depot opened but have since increased and appear to have stabilized.").

Third, Laureate attempts to back away from the statement made in the Nationwide Letter that the Property "ha[d] continuously been for sale" and that Skinner & Broadbent "ha[d] lost a high level of confidence" in the market where the Property was located by arguing that the Nationwide Letter merely reflects that "there were concerns as to whether the Property could meet George Broadbent's portfolio expectations." (Defendants' Response at 37). Laureate cites to Broadbent's deposition for the proposition that the

Property was solid at the time that Lehman purchased the Hickory Ridge Loan and that

Broadbent had not lost confidence in its performance.  (Broadbent Dep. at 18, 31).

Laureate also notes that the Property had been offered for sale twice before Lehman

purchased the Loan at the sums of $22,500,000 and $24,950,000.  (*Id*. at 38-40).  This

evidence raises questions regarding the inferences that should be drawn from the

Nationwide Letter with respect to the reasons Skinner & Broadbent sold the Property

when it did, and are not for the court to decide; rather, they are more appropriately

determined by a trier of fact.

Finally, Laureate argues that the statements made in both the Loan Memo and the

Nationwide Letter are statements of "opinion," not fact.  New York law provides,

however, that "an expression of opinion may be held actionable if it is not sincerely

held."  *Union Carbide Corp. v. Montell N.V.*, 9 F.Supp.2d 405, 409 (S.D.N.Y. 1998);

*Hutton v. Klabal*, 726 F.Supp. 67, 71 (S.D.N.Y. 1989) (A statement of opinion . . .

"constitutes a representation that the opinion is honestly held, and the declaration of an

opinion not honestly held may be found by a jury to be fraudulent."); *Cristallina S.A. v.*

*Christie, Manson & Woods Int'l, Inc.*, 502 N.Y.S.2d 165, 172 (N.Y. App. Div. 1986)

(Even assuming a statement could be characterized as opinion, the speaker "had . . . an

obligation to render such opinion truthfully."); *Nat'l Conversion Corp. v. Cedar Bldg.*

*Corp.*, 23 N.Y.2d 621, 628 (N.Y. 1969) ("[T]he modern rule extends even further to

cover a false opinion of law if misrepresented as a sincere opinion, as in a case of any

other opinion, where there is a reasonable reliance.").  For all of the reasons stated above,

the court declines Lehman's invitation to determine this issue as a matter of law.

Lehman's motion with respect to its claim that Laureate breached the warranty contained

in Section 2(b)(lii) is therefore **DENIED**.

## 2.     Representations and Warranties to Provide True, Accurate, and Complete Information

Lehman also alleges that Laureate breached its representations and warranties that

the information regarding each Mortgage Loan and the origination practices of Laureate

as delivered to Lehman were true and accurate and that it would not omit any material

facts.  These representations and warranties are found in Sections 2(a)(ii) and 2(b)(xlv) of

the MLPSA.  Those Sections provide:

> **No Untrue Information**.  The information regarding the Mortgage Loan,
> the origination procedures of [Laureate], and [Laureate] as delivered to
> [Lehman] is true, correct and complete in all material respects.

(MLPSA § 2(a)(xii)).

> **No Untrue Information**.  No statement, report, or other document
> furnished by or on behalf of [Laureate] in writing (including writings in
> electronic form) relating to the Mortgage Loan contains any untrue
> statement by [Laureate] of any material fact or an omission by [Laureate] of
> a material fact necessary to make the statements contained therein not
> misleading. . .

(*Id*. § 2(b)(xlv)).  Like its breach of warranty claim on grounds of fraud, Lehman

compares the information contained within the Loan Memo with that contained within the

Nationwide Letter, and, based upon those differences, argues that Laureate purposefully

failed to include the summary of negative information in the Loan Memo that it disclosed

to Nationwide in the Nationwide Letter.  Thus, Lehman argues, Laureate did not provide

it with "true and complete" information.

With respect to the warranty contained in Section 2(a)(ii), Laureate responds that the warranty contemplates the totality of the information it provided Lehman, not the individual writings or documents. Thus, they argue that Lehman fails to show that the factual information supplied by Laureate, such as the Property's income and occupancy data, was false. Laureate's response frames the issue too narrowly. Lehman's claim is that the information disclosed to it in the Loan Memo omitted material information. A reasonable juror could conclude that the "information" disclosed in the Loan Memo was therefore not "true, accurate and complete."

With respect to the warranty contained in Section 2(b)(xlv), Laureate argues that "there is a genuine issue of fact as to the identity of the true author(s) of the Loan Memo." (Defendants' Response at 39). In support of its argument, Laureate cites to the testimony of John Herman ("Herman"), a Managing Director of Lehman and member of Lehman's credit committee taken in the Texas Litigation, in which he avers that "Lehman would typically modify the [loan memorandum] to reflect Lehman's input regarding Lehman's evaluation of the property, borrower or any matter affecting the proposed loan transaction." (Affidavit of John Herman, Defendant's Ex. F ¶ 12). Herman, however, testified in this case that "[i]n general, and specifically on [the] Hickory Ridge [Loan]," Lehman made only a few non-substantive changes to the loan memoranda provided to it by Laureate. (Herman Dep. at 49-50).

Laureate also points to the fact that the Loan Memo, dated January 19, 2004, was

36

allegedly sent to Rosenberg from Laureate with other underwriting box materials on January 6, 2004.  Laureate thus argues that the Loan Memo's date is also evidence that the true author of the Loan Memo was not Laureate.  These conflicting facts raise genuine issues of material fact as to the true author(s) of the Loan Memo.  Lehman's motion is therefore **DENIED** with respect to its claim that Laureate breached the warranties provided in Sections 2(a)(ii) and (a)(xlv).

### 3.    Representations and Warranties to Adhere to Commercially Reasonable Origination and Underwriting Standards

Next, Lehman alleges that Laureate made a number of representations and warranties that its underwriting standards were commercially reasonable and customary for a prudent commercial lender, and that Laureate's origination and underwriting practices would comply with those standards.  Specifically, Lehman alleges Laureate breached Sections 2(b)(ii), 2(b)(vi), and 2(b)(xlviii), which read, as follows, below:

> **Origination of Mortgage Loan**.  The Mortgage Loan (including the origination thereof by [Laureate]) complies in all material respects with all terms, conditions and requirements of [Laureate's] underwriting and closing standards (which are commercially reasonable and customary for a prudent commercial lender) in effect when the Mortgage Loan Commitment was issued an on the Closing Date.

(*See* MLPSA § 2(b)(ii)).

> **Origination Practices**.  In connection with the origination of the Mortgage Loan, [Laureate] has employed practices which conform in all material respects to those customarily used by prudent commercial mortgage lenders which originate mortgage commercial loans for securitization transactions.

(*Id*. § 2(b)(vi)).

37

**Underwriting and Origination Policies and Procedures**.  The
underwriting and closing policies and procedures utilized by [Laureate]
with respect to the Mortgage Loan conformed, in all material respects, to its
customary underwriting and closing policies and procedures in effect at the
time of the underwriting and origination of such Mortgage Loan. . .

(*Id.* § 2(b)(xlviii).

In its Reply, Lehman fails to respond to Laureate's arguments with respect to its

claims for breach based on Sections 2(b)(ii) and 2(b)(xlviii) of the MLPSA.  The court

concludes, therefore, that Lehman has abandoned those particular claims for breach.

With respect to the warranty in Section 2(b)(vi), Lehman cites to the deposition testimony

of Laureate executives for the proposition that the information contained within the

Nationwide Letter was material information that a prudent commercial lender would want

to know.  For example, Thomas Dennard ("Dennard"), Laureate's (now former) CEO,

testified: (i) Laureate was bound to disclose all information known to Laureate; (ii) a

prudent lender should consider developments that negatively influence a project's

economics; (iii) information believed to be negatively influencing a project's economics

should be conveyed to the lender; (iv) a prudent lender would want to know if ownership

had lost a high degree of confidence in the property; and (v) that he would expect

Laureate's Loan Memo to convey to the lender information that a prudent lender would

want to know.  (Dennard Dep. at 194-97, 199-201, 210-09, 225).  Larsen, Laureate's

underwriter, testified: (i) developments that negatively influence a project's economics

are something a prudent commercial lender would want to know; (ii) negative

developments affecting the Hickory Ridge Property should have been made known to

38

Lehman; (iii) if Laureate was aware of financial difficulties of an anchor tenant, that information should have been conveyed to Lehman; and (iv) the fact that ownership had lost a high level of confidence in the Property was a fact that should have been conveyed to Lehman.  (Larsen Dep. at 156-60, 163).  Larsen further testified that if Peacock had made him aware of the foregoing information, he would have included it in the Loan Memo to Lehman.  (*Id*.).  Hill, who executed the MLPSA on behalf of Lehman, testified that he previously had been employed as a commercial lender and that the information contained in the Nationwide Letter is information he would want to have known as a lender.  (Hill Dep. at 214-16, 222-25).  Barry Cullen, Laureate's Regional Director of the region in which the Hickory Ridge Property is located, testified that Laureate had a responsibility to alert lenders to negative information about the Property.  (Deposition of Barry Cullen at 58, 63-66).

In addition, Lehman points out that the Laureate employees who would have knowledge as to whether any of the negative information contained in the Nationwide Letter was conveyed to Lehman are Dennard, Gracey, Larsen, and Peacock.  (Plaintiff's Ex. S, Laureate's Responses and Objections to Plaintiff's First Set of Interrogatories ¶ 7).  None of the aforementioned individuals could affirmatively testify that the negative information contained in the Nationwide Letter was communicated to Lehman.  (Dennard Dep. at 197, 222-224; Gracey Dep. at 73-74; Peacock Dep. at 205-06, 221-22, 251); Larsen Dep. at 157-58, 171-72).

Laureate responds that the determination of whether Laureate failed to underwrite

39

or originate the Hickory Ridge Loan in accordance with industry standards cannot be based solely upon the Nationwide Letter.  Laureate points out that those tasks often take months to complete, and require the retention of third parties to perform an appraisal, property condition survey, environmental assessment and survey, and the like.  Laureate also argues that the testimony of the Laureate executives above was taken out of context, and that the determination of whether Laureate complied with industry standards requires expert testimony.

The court is sympathetic to the fact that the statements relied upon by Lehman above are rather general assertions.  However, they are sufficient to raise a genuine issue of material fact with respect to whether Laureate breached the respective warranties contained in Section 2(b)(vi) of the MLPSA.  Moreover, for the reasons explained in Section III.A.3, *infra*, expert testimony is not required in this case.  The testimony cited by Lehman in support of its breach of warranty claim came from Laureate executives who were responsible for determining whether Laureate's loan origination practices conformed to industry standards.  Their testimony is therefore admissible under FED.R.EVID. 701.  *The Braun Corp. v. Maxon Lift Corp.*, 282 F.Supp.2d 931, 933 (N.D. Ind. 2003) ("In its most basic form, Rule 701 allows lay opinion testimony that is based on the witness's personal perception.  Moreover, the Seventh Circuit allows lay opinion testimony based on a witness's specialized knowledge obtained in his or her vocation or avocation.").

Lehman also asserts that Laureate's hiring of Fletcher is yet another instance of

Laureate's failure to conform to industry standards.  In support of this claim, Lehman cites to the testimony of Bradley of Skinner & Broadbent, who opined that it is not prudent to use an appraiser who is not familiar with the jurisdiction where the property is located.  (Bradley Dep. at 8, 170-71).  Lehman also cites Laureate's own underwriter, Larsen, himself an MAI appraiser, who testified that it was common practice to use appraisers familiar with the geographic area.  (Larsen Dep. at 73-74).  In addition to this evidence, Lehman points out that Fletcher was not licensed in Tennessee at the time he was retained by Laureate, and had no appraisal experience in the Memphis area.  Finally, Lehman notes that Fletcher's appraisal failed to include the fact that competition in the area had already begun to negatively influence the Property's economics, or that the Property's owners had been continually trying to sell the Property due to their loss of confidence in the Memphis market.  Lehman's position is that had Laureate hired an appraiser familiar with the Memphis area, the appraisal likely would have included such information.

Laureate counters by touting Fletcher's qualifications as an appraiser, including the fact that Fletcher has been a member of the MAI since 1987, has previously performed appraisals of property in Tennessee, and his twenty years' experience in the industry as a whole.  (Fletcher Dep. at 9-21, 211). Laureate dismisses the fact that Fletcher was not licensed at the time he was retained, since obtaining a temporary license in Tennessee only required Fletcher to pay a fee, and, in any event, he was licensed at the time he issued his report.  (*Id*. at 161, 211).  Finally, Laureate attacks Lehman's assertion

41

that an appraiser familiar with the Memphis market would have likely noted the information it claims was absent from the appraisal, as Lehman's assertion is nothing more than speculation.

The parties' arguments and counter-arguments with respect to Fletcher's qualifications and the propriety of hiring him in the first place clearly raise genuine issues of material fact on this breach of warranty claim. Lehman's motion is therefore **DENIED** with respect to its claim that Laureate breached the warranties provided in Section 2(b)(vi).

### 4. Representations and Warranties Designed to Prohibit Self-Dealing

Lastly, Lehman alleges that Laureate was prohibited from engaging in certain transactions with correspondents over which Laureate could exercise its influence. Specifically, Laureate made the following representations and warranties to Lehman with respect to each mortgage loan sold to Lehman:

> **Proceeds of Mortgage Loan**. The proceeds of the Mortgage Loan have not been used to satisfy, in whole or in part, any debt owed or owing by the Borrower to [Laureate] (other than any loan origination fee paid on the origination date). To the Best Knowledge of [Laureate] (based upon a representation obtained from the Borrower), the proceeds of the Mortgage Loan have not been and shall not be applied to satisfy, in whole or in part, any debt owing by the Borrower to a commercial mortgage banker/broker which is a correspondent of [Laureate] with respect to the Mortgage Loan ("Correspondent") with respect to the origination of such Mortgage Loan whereby such Correspondent has taken or will take (1) a discounted payoff of such debt in connection with such application or (2) a subordinated lien on any property securing such debt or an equity interest in the Borrower in connection with such application unless, in any such case, such fact is disclosed in the list of exceptions included in the Mortgage File and is

> expressly approved in writing by [Lehman] in connection with its purchase
> of the Mortgage Loan.

(MLPSA § 2(b)(xxvii).  Lehman's facts in support are that Laureate negotiated the prepayment penalty on the Hickory Ridge Loan on behalf of Skinner & Broadbent and then used the proceeds of the Mortgage Loan to satisfy the reduced prepayment penalty owed to Nationwide, Laureate's "preferred lender."  R. Jeffrey Turnage, Laureate's 30(b)(6) corporate designee, testified that Nationwide was a Correspondent at the time the Hickory Ridge Loan closed.  (Turnage Dep. at 163-64, 166).  Turnage also testified that Laureate did not get an exception from Lehman in writing and, thus, had not satisfied the requirements of Section 2(b)(xxvii) of the MLPSA.  (*Id*. at 172).

Laureate responds that (1) Lehman never informed Laureate that it intended to rely upon this warranty in support of its claim; (2) the prepayment penalty was not a "debt", and thus, the warranty was not breached; and (3) Lehman has waived its right to rely upon this warranty.

### a.    Notice

Laureate contends that neither Lehman's Complaint, the First Amended Complaint, nor the Second Amended Complaint alleged that it breached Section 2(b)(xxvii) of the MLPSA.  Moreover, Lehman did not timely supplement its discovery responses to include this claim.

Lehman responds that its Second Amended Complaint alleged that Laureate made various representations and warranties ". . . including, but not limited to . . ." certain

specified provisions.  (Second Amended Complaint ¶ 6).  Further, the Second Amended

Complaint alleged that MCI was engaged by the owner of the Hickory Ridge Property to

obtain refinancing and, as a result of the Nationwide Letter, agreed to reduce the

prepayment penalty to facilitate the refinancing. (*Id.* ¶ 10).  The court finds these

allegations to be sufficient notice to Laureate of Lehman's claim.  Even if Lehman's

notice was insufficient, the court finds Laureate was not prejudiced, as its 30(b)(6)

witness, Turnage, was questioned with respect to this issue.

### b.      The Reduction of the Prepayment Penalty

A prepayment penalty is the sum a lender receives when a loan is paid in full prior

to maturity to compensate the lender for lost interest payments.  *Stutman v. Chemical

Bank*, 95 N.Y.2d 24, 31 (N.Y. 2000).  Thus, Laureate argues that the reduction of the

prepayment penalty was not a reduction of the "debt" that Skinner & Broadbent owed

Nationwide on the Hickory Ridge Loan.  In support of this assertion, and in response to

Lehman's claim, Laureate cites to the "corrected" testimony of Turnage.  In his later

deposition testimony, Turnage testified as follows:

> Q:    And is it Laureate's belief that the Nationwide [i.e. Hickory Ridge]
>       loan was discounted in any way at the time it was refinanced?
>
> A:    No.  The loan was paid off in full.  The prepayment penalty was
>       adjusted, but that was a premium for payment – the indication from
>       the commercial lender's standpoint, the concern would be if the prior
>       loan was being repaid at less than par, less than the face amount of
>       the loan, then that would indicate that there was a credit problem
>       with regard to that borrower . . .

(Turnage Dep. at 8-9).

Lehman responds that the term "debt" as used in § 2(b)(xxvii) of the MLPSA is used in a very general sense and could encompass the prepayment penalty at issue.

The court finds that arguments presented by the parties present a genuine issue of material fact as to the definition of the term "debt," and thus, the court is precluded from ruling on Lehman's claim as a matter of law.

### c.     Waiver

Laureate's final challenge to Lehman's claim of breach is that Lehman was fully aware of the prepayment reduction and of Laureate's relationship with Nationwide prior to closing.  In support of this contention, Laureate cites the court to Rosenberg's deposition at pages 40-42, wherein he asserts he was aware of the prepayment penalty, its discounting, and the significance of Nationwide as a Laureate customer.  In response, Lehman contends that Rosenberg did not testify in such concrete terms.

A review of the relevant testimony reflects that Rosenberg "knew there was" a loan on the Hickory Ridge Property, that he was "probably aware of the Nationwide loan on Hickory Ridge," and that he thought "there was a small discount that they were willing to take on the loan."  (*Id.* at 40-41).  Rosenberg did not testify that he knew of any alleged misapplication of the proceeds of that loan or that he knew Nationwide was a "Correspondent" of Laureate.  Consequently, the court finds a material issue of fact as to whether Lehman waived its right to bring a breach of warranty claim under Section 2(b)(xxvii) of the MLPSA.

45

### d.    The MLPSA

Laureate's final argument is that there is an issue of fact as to whether the MLPSA applies to the Hickory Ridge Loan.  If it does not, Lehman's breach of warranty claims based upon the MLPSA must be dismissed.

In support of this argument, Laureate cites the court to the Purchase Commitments executed on December 19, 1997, and January 23, 1998, which are the documents by which Lehman communicated to Laureate its desire to fund the Hickory Ridge Loan.  The Purchase Commitments reference an agreement entitled, "Multifamily and Commercial Mortgage Loan Agreement (Simultaneous Funding) (the "Agreement") between Lehman Brothers Holdings, Inc., doing business as Lehman Capital ("Lehman") and Laureate Realty Services, Inc. (the "Originator").  (Defendants' Ex. I).  The Purchase Commitments indicate that they are "expressly subject to the satisfaction of all funding conditions in the Agreement."  The final line of the Purchase Commitments provide, "The Originator agrees to be bound by all applicable terms of the Agreement, including, but not limited to Sections 2.9 and 8.12."  (*Id.*).  The MLPSA does not contain Sections 2.9 and 8.12.

In addition, the MLPSA calls for Laureate to transfer the Loan to Lehman by way of an Assignment of Mortgage " . . . in substantially the form of Annex B [to the MLPSA] . . .".  (MLPSA, Annex B).  The form Assignment of Mortgage and Assignment of Leases and Rents attached as Annex B to the MLPSA contains multiple provisions indicating that a loan would be transferred subject to the terms contained in the

"Mortgage Loan Purchase and Sale Agreement."  The Transfer Documents, used to transfer Laureate's interest in the Hickory Ridge Loan, however, make no mention of the MLPSA.  As noted in Section A.2.c., the Transfer Documents indicate that the Note, Mortgage and Assignment of Leases and Rents are being transferred "without representation, recourse or warranty" – in contradiction to the numerous warranties contained in the MLPSA.

The MLPSA also provides that, "The Seller agrees to sell, and the Company agrees to purchase, from time to time, mortgage loans . . . in the form attached as Annex A. . .".  (MLPSA at Introduction).   A document entitled Annex A was not produced in discovery.

Lehman retorts that Laureate's argument that the MLPSA does not apply is "ridiculous."  Lehman cites to the testimony of Laureate's former CEO Dennard who testified that it was his intent that Laureate be bound by the MLPSA and through it made certain representations and warranties to Lehman.  (Dennard Dep. at 148-49, 238-39).  Senior Vice President Hill further testified that the MLPSA governed all loan transactions between Lehman and Laureate.  (Hill Dep. at 156-57).

Lehman also cites to the May 1, 1997, Multifamily and Commercial Servicing Agreement ("Servicing Agreement"), whereby Laureate contracted to service loans to Lehman, which defined the term "Mortgage Loan Purchase Agreement as the MLPSA dated May 1, 1997.  (Plaintiff's Ex. QQ).  It is undisputed that Laureate serviced the Hickory Ridge Loan pursuant to the Servicing Agreement.

Finally, Lehman points to Laureate's own letter dated October 28, 2004, objecting to the adequacy of Lehman's notice of default under the MLPSA regarding the Hickory Ridge Loan. (Plaintiff's Ex. RR).

The court finds the evidence presented by both sides creates a genuine issue of material fact as to whether the MLPSA should be applied to the Hickory Ridge Loan. Lehman's motion for partial summary judgment on its breach of contract claim is therefore **DENIED**.

### 3. Evidentiary Matters

In Laureate's Response to Lehman's Motion for Partial Summary Judgment, Laureate contends that the following evidence relied upon by Lehman is inadmissible: (1) the internal Nationwide Loan Servicing Recommendation ("Nationwide Memo"); (2) the opinion testimony of Joyce Bradley; (3) opinion testimony of Thomas Dennard and Mark Hill; and (4) the deposition testimony of Thomas Peacock taken in the Texas Lawsuit.

### a. The Nationwide Life Insurance Memorandum

The Nationwide Memo was originally introduced as Exhibit 7 to Peacock's deposition in the Texas Lawsuit. (Lehman produced the document in this litigation as Exhibit 7 to the Peacock deposition transcript at Lehman 03 01432-33). The Nationwide Memo is a document approving the prepayment penalty reduction on the Hickory Ridge Loan that Laureate negotiated on Skinner & Broadbent's behalf. On the second page is a handwritten comment, "Seems like a good time to get out of this one." (Plaintiff's Ex. Z, Nationwide Loan Servicing Recommendation). Laureate challenges the admissibility of

48

this document and, in particular, the handwritten comment, as inadmissible hearsay.

The court finds the Nationwide Memo is admissible as a business record under FED.R.EVID.803(6). It was produced by Nationwide as part of its records relating to the Hickory Ridge Loan and was part of Nationwide's regular approval process for prepayment penalty reductions, as evidenced by the signatures evidencing the same.

With respect to the handwritten note, "Seems like a good time to get out of this one," the court finds the statement to be admissible under FED.R.EVID. 801(d)(2) as an admission by a party opponent, as the handwritten note was written by an agent of Laureate with authority to sign the Nationwide Memo. The court further finds the statement admissible under FED.R.EVID. 801(c) as it is not admitted for its truth, but simply to show that the statement was made. *See* FED.R.EVID. 801(c) advisory committee's note (citing *Emich Motors Corp. v. General Motors Corp.*, 181 F.2d 70 (7th Cir. 1950), *rev'd on other grounds*, 340 U.S. 558 (1951)).

### b.   The Opinion of Joyce Bradley

Laureate next challenges the opinion of Bradley, an Executive Vice President of Skinner & Broadbent, who testified that it was not customary in the industry to use an appraiser (Fletcher) who is not familiar with the area in which the appraisal is being performed, and that it would be prudent to hire someone in the city where the project is located. (Bradley Dep. at 8, 170-71). Laureate contends that she is not qualified to render opinions with respect to industry practices for retention of real estate appraisers. Laureate also contends that Bradley was not designated by Lehman as an opinion witness

49

to render such an opinion, and failed to file an expert disclosure prior to filing this motion as required by the parties' Case Management Plan.

The court finds Bradley's opinion testimony is admissible under FED.R.EVID. 701. That Rule allows lay opinion testimony that is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED.R.EVID. 701. This Rule has been interpreted to allow "lay opinion testimony based on a witness's specialized knowledge obtained in his or her vocation or avocation." *See The Braun Corp.*, 282 F.Supp.2d at 933; *see also Blair v. City of Evansville, Indiana*, 361 F.Supp.2d 846, 850 (S.D. Ind. 2005) (Secret Service Agent qualified to testify as to the security plans for Vice President Cheney's visit as his "comments about the security zone and the demonstrator area are 'rationally based on . . . perception' because he relies upon his own assessment of the area within the context of his experience. . .").

At the time of her deposition, Bradley was an Executive Vice President of administration and finance for Skinner & Broadbent's real estate company. (Bradley Dep. at 8-9). In her role as Executive Vice President, she was involved in the financing and refinancing of shopping centers; she worked to find permanent financing after construction loans matured, from preparing the package to working with a broker to obtain lender quotes and, after a lender was selected, through due diligence to closing. (*Id*. at 10). Bradley was personally involved in the loan financing process and operations

50

for the Broadbent companies on a day-to-day basis for more than thirty years and was a part of senior management.  She had more than adequate experience in commercial loan financing to present an opinion regarding the qualifications she would expect to find of appraisers in the industry in which she worked, as well as the practice in the industry regarding their selection.  The court therefore finds that Bradley's testimony that it is not customary or prudent in the industry to use an appraiser unfamiliar with the area in which the appraisal is to be performed, that it would be prudent to use someone in the city where the project is located, and likewise that it would be imprudent to use someone not licensed in the jurisdiction in which the appraisal is performed at the time the appraisal is done, are based on her experience and are admissible.  (Bradley Dep. at 170-71).  Moreover, because Bradley's testimony is admissible under Rule 701, Lehman was not required to disclose her as an expert witness, nor was Bradley required to file an expert disclosure.  *See* FED.R.CIV.P. 26(a)(2).

### c.    The Opinions of Thomas Dennard and Mark Hill

Laureate essentially makes the same challenge to the testimony of Dennard and Hill as it did with respect to Bradley's testimony.  Dennard was Laureate's President and Chief Executive Officer as well as a Director; Hill was a Senior Vice President of Laureate who executed the MLPSA on Laureate's behalf and was responsible for loan servicing and loan closing at various times in the Hickory Ridge Loan transaction. (Dennard Dep. at 12-13, 17-18; Hill Dep. at 19-21, 24-26, 86-87).  Dennard had been in the mortgage banking/loan origination business since 1978 and was the first president and

CEO of Laureate in 1994.  (Dennard Dep. at 11, 16-17).  Hill had worked in public accounting, bank examination, and mortgage banking.  (Hill Dep. at 11).

Dennard testified that a mortgage broker such as Laureate would convey all market condition information in its possession to the person with whom it was doing business. (Dennard Dep. at 196-97, 200-01).  Dennard spoke from personal knowledge when testifying that he would expect the Loan Memo to convey the information a prudent lender would want to know, (*id*. at 210), as well as that a prudent lender should consider developments which negatively influence a project's economics and that such information should be conveyed to the lender (*id*. at 194-97).

Hill was asked if Laureate normally would convey information negatively impacting a project's economics and he testified that they would.  (Hill Dep. at 214-15). Such direct testimony is based on his knowledge of the practices of the company he worked for.  Likewise, he agreed that, as a lender, the information in the Nationwide Letter was information he would have wanted to know.  (*Id*. at 222-225).

Given Dennard's and Hill's respective positions with Skinner & Broadbent and work-related experiences, the court finds they are qualified to testify about Laureate's practices as well as common industry practices.

### d.      Peacock's Deposition from the Texas Lawsuit

Laureate seeks to strike the deposition of Peacock taken in the Texas Lawsuit in 2004 on grounds that (1) there is no substantial identity of issues between this case and those advanced in the Texas Lawsuit and (2) there was no adversary at the deposition to

52

cross-examine Peacock.

FED.R.CIV.P. 32(a) reads in relevant part:

**(a) Use of Depositions**.  At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

                              *   *   *   *

(4) [W]hen an action has been brought in any court of the United States or of any State and another action involving the same subject matter is afterward brought between the same parties or their representatives or successors in interest, all depositions lawfully taken and duly filed in the former action may be used as if originally taken therefor.  A deposition previously taken may also be used as permitted by the Federal Rules of Evidence.

The Complaint in the Texas Lawsuit alleged, *inter alia*, that Lehman breached certain representations and warranties with respect to the Hickory Ridge Loan.  Chief among those allegations were (1) that the origination practices of Lehman or any prior holder of the Mortgage Note were legal and met customary industry standards and (2) that the information pertaining to each Mortgage Loan in the Mortgage Loan Schedule was true and correct in all material respects as of the cut-off Date.  (Plaintiff's Ex. JJ ¶¶ 25(c), (d)).  By virtue of its Settlement with ORIX, Lehman is the successor in interest to ORIX and was assigned the litigation rights relating to the Hickory Ridge Loan.  For these reasons, the court finds Peacock's deposition is admissible as evidence.

### B.    Count I, Fraud

Count I of Lehman's Second Amended Complaint alleges fraud.  As was discussed in Section III.A.2.d.1, Lehman alleges that Laureate failed to disclose material facts in the Loan Memo regarding the Hickory Ridge Property as evidenced by statements made in the Nationwide Letter, that Lehman justifiably relied upon the Loan Memo to its detriment, and that Lehman has been damaged as a result of Laureate's non-disclosure. Laureate moves for summary judgment on this claim on the following grounds: (1) Lehman's fraud claim is duplicative of its breach of contract claim; (2) Lehman cannot establish the elements of fraud; and (3) Lehman's claim is untimely.

With respect to the first ground stated above, a fraud claim may be dismissed as duplicative when the "only alleged fraud related to a breach of contract." *Metro. Transp. Auth. v. Triumph Adver. Prod., Inc.*, 497 N.Y.S.2d 673, 675 (1st Dept. 1986).  If the facts alleged by the plaintiff purportedly give rise to a breach of a contractual duty, the plaintiff may only recover for fraud, under New York law, if: (1) the plaintiff demonstrates a legal duty separate from the duty to perform under the contract; (2) the plaintiff proves a misrepresentation collateral or extraneous to the contract; or (3) the plaintiff seeks special damages resulting from the misrepresentation that are not recoverable as contract damages.  *Bridgestone/Firestone, Inc. v. Recovery Credit Serv., Inc.*, 98 F.3d 13, 20 (2nd Cir. 1996). Laureate asserts that Lehman's fraud claim is duplicative because it is merely a recitation of its breach of warranty claims, particularly the warranty providing that:

No statement, report or other document furnished by [Laureate] in writing

. . . relating to the Mortgage Loan contains any untrue statement by
[Laureate] of any material fact or an omission by [Laureate] of a material
fact necessary to make the statements contained therein not misleading . . .".

(*See* MLPSA § 2(b)(xvi)).

Lehman responds that its fraud claim is not duplicative because Laureate owed it a

duty to disclose separate and apart from the MLPSA.  In support of this proposition, it

contends that Laureate's own witnesses testified that it owed Lehman a special duty.  The

testimony Lehman relies upon for this proposition, however, is the testimony of

Laureate's expert witness, Thomas Tarter ("Tarter"), who testified, in relevant part:

> Q:    Sir, if Laureate had concluded that competition in the Hickory Ridge
>       area was negatively impacting the economics of the Hickory Ridge
>       property, did it have an obligation to disclose that information to
>       Lehman Brothers?
>
>                          *    *    *
>
> A:    In my opinion, given the circumstances, that would be subject to an
>       interpretation of the relative events.  And as part of its responsibility,
>       it would be required - - and, in fact, did in this case - - communicate
>       information or cause to be communicated to Lehman information
>       relative to competition, other competing malls, vacancies and put
>       Lehman into a position to make its decision which is the right thing
>       to do.

(Deposition of Thomas Tarter at 300-02).

Tarter's testimony does not raise an issue of fact as to whether Laureate owed

Lehman a special duty.  In fact, it proves nothing at all, except that, in his opinion,

Laureate fulfilled its contractual duty to disclose all material information in its possession

to Lehman prior to the closing of the Hickory Ridge Loan.

Lehman also points to the Mortgage Bankers Association's Canons of Ethics, which require loan originators "to provide accurate information and to disclose any material, negative information." Lehman, however, fails to cite any authority suggesting that this industry standard can give rise to an independent and enforceable legal duty. Accordingly, the court finds that as between these sophisticated business entities, Laureate did not owe Lehman a duty separate and apart from the MLPSA.

Next, Lehman argues that Laureate's misstatements were collateral or extraneous to the MLPSA. In support of its position, Lehman relies upon *First Bank of the Americas v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17 (N.Y. App. Div. 1999). In that case, plaintiff First Bank of the Americas ("First Bank") and defendant Motor Car Funding, Inc. ("MCF") entered into a purchase and sale agreement, which established the terms under which MCF would sell used car loans to First Bank. *Id*. at 19. The parties' contract contained warranties to the effect that the loans would comply with certain underwriting guidelines. *Id*. In the course of offering loans to First Bank under the agreement, MCF made representations to First Bank about the quality of the collateral, the individual borrowers' credit history, and the amount of the borrowers' down payment. *Id*. First Bank eventually sued, contending, *inter alia*, that many of the representations by MCF were false and that MCF thereby induced First Bank to buy loans which it otherwise would not have bought. *Id*. First Bank brought suit for various alleged breaches of the parties' contract. *Id*.

MCF contended that First Bank's fraud claims should be rejected because they

56

were "redundant" of the breach of contract claims.  The Court rejected MCF's

contentions:

> [I]f a plaintiff alleges that it was induced to enter into a transaction because
> a defendant misrepresented certain material facts, the plaintiff stated a claim
> for fraud even though the same circumstances also give rise to the
> plaintiff's breach of contract claim.  Unlike a misrepresentation of future
> intent to perform, a misrepresentation of present facts is collateral to the
> contract (though it may have induced the plaintiff to sign the contract) and
> therefore involves a separate breach of duty.

*Id*. at 21.  The Court further stated:

> Nor is the fraud claim rendered redundant by the fact that these alleged
> misrepresentations breached the warranties made by MCF in the Agreement
> . . . The core of plaintiff's claim is that defendants intentionally
> misrepresented material facts about various individual loans so that they
> would appear to satisfy these warranties, because otherwise plaintiff would
> have neither the obligation nor the desire to purchase them.  This is fraud,
> not breach of contract.

*Id*.

At first blush, *First Bank of the Americas* appears to be directly on point.

However, that case did not include a contractual provision like the MLPSA which

expressly disclaimed all representations and warranties made outside of the parties'

contract.  Specifically, paragraph 2(c) of the MLPSA provides that the parties:

> [E]xpressly negate and exclude all warranties and representations,
> including, without limitation, all implied warranties arising by applicable
> law, except for the specific representations and warranties set forth in this
> Agreement.

Moreover, the document upon which Lehman's fraud claim is based – the Loan

Memo – was provided to Lehman prior to the closing of the Hickory Ridge Loan and was

provided as part of Laureate's duties as loan originator.  The alleged material omissions in the Loan Memo are clearly contained within Section 2(b)(xvi) of the MLPSA. Lehman's fraud claim is therefore duplicative of its breach of contract claim.  Laureate's motion for summary judgment on Lehman's fraud claim is therefore **GRANTED**.

### C.   Punitive Damages

Lastly, Laureate argues that Lehman's claim for punitive damages fails as a matter of law.  Lehman's Response contains no argument or evidence showing that its claim has merit.  The court therefore concludes that Lehman has abandoned this claim for relief. Accordingly, the court **GRANTS** Laureate's motion for summary judgment with respect to Lehman's punitive damages claim.

## V.   NetBank's Motion for Summary Judgment on Count III

Count III of Lehman's Second Amended Complaint seeks a declaration that "NetBank and/or FSB are liable to Lehman under the MLPSA and related agreements . . .".  (Second Amended Complaint at 12).  NetBank moves for summary judgment on Count III on grounds that it was not a successor to, or distributee of, Laureate; thus, under no circumstances could it be held liable to Lehman.  An analysis of NetBank's position requires the court to discuss the corporate transactions which occurred in November 2001 and beyond.

In November 2001, NetBank, Resource and Palmetto entered into an agreement and plan of merger which provided for Resource to merge into Palmetto, a wholly owned subsidiary of NetBank created for the sole purpose of acquiring Resource's shares.  As a

result of the transaction, Resource became a wholly owned subsidiary of NetBank.

At the time of Laureate's dissolution in March 2002, Laureate was a South Carolina corporation and its sole shareholder was Resource. (Turnage Aff. ¶ 5).  Pursuant to South Carolina Code § 33-13-107(d)(2), a claim against a dissolved corporation may be enforced against the dissolved corporation's shareholder "to the extent of his pro rata share of the claim or the corporate assets distributed to him in liquidation, whichever is less, but a shareholder's total liability for all claims under this section may not exceed the total amount of assets distributed to him."  S.C. CODE § 33-13-107(d)(2); *see also U.S. v. P.F. Collier & Son Corp.*, 208 F.2d 936, 937 (7th Cir. 1953) (explaining that the effect of dissolution is determined by law of the state of incorporation).  All of Laureate's assets were distributed to Resource upon Laureate's dissolution.  (Turnage Aff. ¶ 5).  Thereafter, pursuant to the plan of merger, NetBank transferred Resource's stock to FSB in June 2002 and, upon Resource's dissolution in 2004, Resource's assets were distributed to FSB, its sole shareholder.  In other words, NetBank received no assets from Laureate, was never a shareholder of Laureate, or in any way affiliated with Laureate; therefore, NetBank is not Laureate's distributee.  (*Id*. ¶¶ 5, 9, 10).

Lehman responds that there exists a genuine issue of material fact as to whether NetBank merged with Resource, resulting in an assumption by NetBank of Resource's liabilities, including Resource's liabilities as a distributee of Laureate's assets.  In support of this position, Laureate cites to NetBank's Answer, Amended Answer, and Second Amended Answer, which "admit" that NetBank merged with Resource.  (*See* NetBank's

59

Answer ¶ 22; NetBank's Amended Answer ¶ 22; NetBank's Second Amended Answer ¶

22).  In response, NetBank asserts that the "admissions" alleged in the Answer and

Amended Answer (Docket Nos. 38 and 55) were the product of an error by counsel, as

evidenced by both NetBank's and Resource's motions seeking leave to file Amended

Answers to allege the reverse triangular merger and to deny that NetBank was Resource's

successor.  (*See* Resource's Motion for Leave to File Amended Answer to Amended

Complaint; NetBank's Motion for Leave to File Amended Answer to Amended

Complaint).  With respect to the "admission" in its Second Amended Answer, NetBank

explains that this too was an error by counsel as evidenced by the fact that Resource's

Second Amended Answer, filed on the same day by the same counsel, contains no

assertion that NetBank and Resource merged.  (*See* Resource's Second Amended Answer

¶ 22).  NetBank also asserts that Lehman's Second Amended Complaint and State Court

Complaint support its position that NetBank only acquired the shares of Resource and

that the triangular merger between Resource, NetBank and Palmetto did, in fact, take

place.  (*See* Second Amended Complaint ¶ 23; NetBank's Ex. C).

   Whether or not the parties' pleadings contain errors or not, on summary judgment,

Lehman, as the party opposing summary judgment, had the burden to come forward with

competent evidence to raise a genuine issue of material fact.  Lehman's reliance on

NetBank's Answers are insufficient to raise a genuine issue of material fact under Rule 56

of the Federal Rules of Civil Procedure:

   When a motion for summary judgment is made and supported as provided

60

in this rule, an adverse party may not rest upon the mere allegations or
denials of the adverse party's pleading, but the adverse party's response, by
affidavits or as otherwise provided in this rule, must set forth specific facts
showing that there is a genuine issue for trial.  If the adverse party does not
so respond, summary judgment, if appropriate, shall be entered against the
adverse party.

FED.R.CIV.P. 56(e).

Lehman also asserts that "NetBank received at least $80 million in assets as a
result of its other business transactions with [Resource] – which presumably included the
admitted merger with [Resource]."  (Lehman's Response at 11).  The testimony Lehman
relies upon unequivocally reflects that assets were distributed to NetBank that could not
be distributed to FSB, a federally regulated bank, because of restrictions imposed by the
Office of Thrift Supervision.  (Turnage Dep. at 15-19).  To the extent Lehman asserts that
NetBank and Resource effectuated a *de facto* merger, Lehman provides no analysis of
how such a merger occurred or any facts to supports its contention.  Accordingly, for the
reasons explained above, the court finds NetBank is not liable as a successor to, or
distributee of, Laureate's liability under the MLPSA.

Even if Lehman had a legal or factual basis for its claim against NetBank, its claim
is moot following the entry of the State Court Judgment.  South Carolina law is clear that
liability for all distributees (or the successors of distributees) of a dissolved corporation
cannot exceed the sum of assets distributed by the dissolved corporation upon its
dissolution.  S.C. CODE § 33-14-107(d)(2).  Lehman does not dispute this proposition.
Likewise, it is undisputed that when Laureate dissolved, it distributed $14.1 million to its

61

shareholder, Resource.  Thus, the total liability for all successors to Resource for

Laureate's alleged acts and omissions cannot exceed $14.1 million.  Lehman has an

Agreed Judgment that FSB, Resource's successor, will be responsible for any judgment

entered against Laureate up to the sum of $14.1 million.  Lehman has all of the relief to

which it is legally entitled and therefore its claims against NetBank are moot.  *See Church

of Scientology of California v. U.S.*, 506 U.S. 9, 12 (1992) (explaining that case is moot

when the court can provide no further relief to a party).  NetBank's Motion for Summary

Judgment on Count III is therefore **GRANTED**.

## VI.    Conclusion

The court finds material issues of fact remain as to whether Laureate breached the

MLPSA.  Accordingly, the court **DENIES** Lehman's Motion for Partial Summary

Judgment on the Issue of Liability of Laureate on Count II of Lehman's Second Amended

Complaint.  (Docket # 193).  The court also finds that Lehman's fraud claim is

duplicative of its breach of contract claim, and that Lehman, by failing to respond to

Laureate's motion for summary judgment with respect to it punitive damages claim,

abandons that claim.  The court further finds that the statute of limitations does not bar

Lehman's breach of contract claim.  Accordingly, the court **GRANTS** in part and

**DENIES** in part Laureate's Motion for Summary Judgment (Docket # 188), and

**GRANTS** Peacock's motion for summary judgment (Docket # 187).  In addition, the

court finds that oral argument is not warranted with respect to Laureate's and Peacock's

motions for summary judgment.  Accordingly, Laureate's and Peacock's Request for Oral

Argument (Docket # 217) is **DENIED**.  Lastly, the court finds that NetBank is not a distributee or successor of Resource.  Accordingly, NetBank's Motion for Summary Judgment (Docket # 190) is **GRANTED**.

**SO ORDERED** this  28th   day of September 2007.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Adam  Arceneaux
ICE MILLER LLP
adam.arceneaux@icemiller.com

H. Nicholas Berberian
NEAL GERBER & EISENBERG
nberberian@ngelaw.com

Steven G. Cracraft
BINGHAM MCHALE
scracraft@binghammchale.com

Joel Elias Harvey
HAYES COPENHAVER CRIDER
jharvey@hcclaw.com

R. Scott Hayes
HAYES COPPENHAVER CRIDER
shayes@hcclaw.com

Patrick G. King
NEAL GERBER & EISENBERG
pking@ngelaw.com

David M. Mattingly
ICE MILLER LLP
david.mattingly@icemiller.com

Gregory A. Neibarger
MCTURNAN & TURNER
gneibarger@mtlitigation.com

Wayne C. Turner
MCTURNAN & TURNER
wturner@mtlitigation.com